**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ONESIMUS GAYEMEN,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE SCHOOL DISTRICT OF THE<br>     CITY OF ALLENTOWN;<br>SHAWNDELL CANNON;<br>GREGORY GOODIN;<br>JACOB FERNANDEZ; and<br>JAHMEEN QUICK,<br><br>                    Defendants | CIVIL ACTION NO. 14-CV-1518 |

**Henry S. Perkin, M.J.**                                          **May 26, 2016**

## MEMORANDUM

This matter is before the Court on Defendant Allentown School District's Motion for Summary Judgment, which motion was filed February 22, 2016.  Plaintiff's Reply to Defendant, The School District of the City of Allentown's, Motion for Summary Judgment was filed on March 14, 2016.  The Reply Brief of Allentown School District in Support of Motion for Summary Judgement was filed March 24, 2016.  Oral argument on the record was held on May 16, 2016.  Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

## Procedural History

Plaintiff Onesimus Gayemen ("Gayemen") initiated this matter by filing a Complaint in the Lehigh County Court of Common Pleas against Defendants Shawndell Cannon ("Cannon"), Gregory Goodin ("Goodin"), Jacob Fernandez ("Fernandez"), and Jahmeen Quick

("Quick"). Gayemen then amended the complaint to include claims against the School District

of the City of Allentown ("School District"). This matter was subsequently removed to this

Court by the School District.

Gayemen alleges that on March 30, 2011,[1] he was attacked by four fellow students

on William Allen High School property, and that he suffered a broken jaw as a result. In Count

Eight of the Second Amended Complaint,[2] Gayemen sets forth a Fourteenth Amendment claim

---

[1]       It has come to the attention of the Court that the parties have entered into a stipulation with respect to the precise date of the incident in question. According to the Pretrial Memorandum (Dkt. No. 90) submitted on behalf of Gayemen, at the time of drafting the pleadings in this matter, Gayemen was unsure of the exact date of the incident. The Second Amended Complaint states the incident occurred, "[u]pon information and belief, on or about Monday, March 21, 2011, at William Allen High School, Onesimus Gayemen, while walking between the main building and gym was approached by the four individual Defendants." See Dkt. No. 41. However, the video recording (Dkt. No. 75, Exhibit A) of the incident and School Incident Report (Dkt. No. 73-3), indicate the date of the incident is March 30, 2011. Accordingly, Gayemen concedes that the incident occurred on March 30, 2011.

[2]       Following removal to this Court, the School District filed a motion to dismiss the amended complaint, seeking dismissal of all claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). The School District's motion to dismiss was granted by the Court by an Order dated October 24, 2014. The Court considered Gayemen's Section 1983 claim under the "state-created danger" theory of liability and concluded that Plaintiff had failed to satisfy the third and fourth elements of this doctrine, but that with further factual averments he might be able to satisfy both. Accordingly, the Court ordered that the Section 1983 claim be dismissed "without prejudice for [P]laintiff to file a second amended complaint which clearly avers the factual and legal basis" for those claims.

Gayemen filed a Second Amended Complaint on November 28, 2014 containing additional allegations concerning his Section 1983 claim. The School District filed a second motion to dismiss on December 11, 2014. The Honorable Joseph F. Leeson, via Order dated April 16, 2015, denied the School District's motion to dismiss. In an accompanying Memorandum, Judge Leeson provided the following basis for allowing Gayemen's claim against the School District to proceed to discovery:

> Plaintiff, Onesimus Gayemen, alleges he was attacked by four fellow students at William Allen High School. He claims that the School District knew about past violent assaults by the four fellow students, but concealed and did not report the earlier assaults to the police. The Court concludes that Plaintiff has alleged a violation of his Fourteenth Amendment substantive due process right pursuant to the "state-created danger" theory of liability, therefore the Motion to Dismiss is denied.

See Dkt. No. 48, Memorandum at 1, 4-5. In denying the Motion to Dismiss, Judge Leeson did not make any determination as to whether the School District did or did not conceal student assaults; only that the facts alleged may constitute affirmative acts under Third Circuit precedent. See Dkt. No. 48, Memorandum at 5. Judge Leeson further noted that "as this case proceeds through discovery, [Plaintiff's] counsel must focus on discovering what actions [Defendant] took, rather than on what actions [it] failed to take, if [he] intend[s] [his] claims in Count [Eight]

2

pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that the School District violated his constitutional right to bodily integrity because the School District knew about past violent assaults committed by its students, including the four individual defendants, and concealed these past assaults in order to avoid public scrutiny, which directly led to the attack against him.

The parties engaged in discovery and this Court, by virtue of its January 14, 2016 Order, directed that all dispositive motions (including a separate, short and concise statement of material facts) be filed on or before February 22, 2016. The School District now moves this Court to grant summary judgment in its favor, and dismiss Count 8 of the Second Amended Complaint, the only claim asserted against the School District. The School District's motion is now ripe for disposition.

## Facts

Based upon the record papers, exhibits, depositions, and the parties' statements of the facts,[3] the pertinent facts to this Court's determination are as follows:

At some point in March 2011, Gayemen became a student of the School District at the William Allen High School ("Allen").[4] On March 30, 2011, after Gayemen was at the School District attending Allen for just a few days, he was assaulted by four other Allen students. The students who assaulted Gayemen were Cannon, Goodin, Fernandez, and Quick. In the few

---

to survive a motion for summary judgment." See id.

[3]     In conjunction with the filing of their motion for summary judgment on February 22, 2016, the School District submitted its statement of material facts. See Dkt. No. 70-2. Gaymen responded to this statement of material facts on March 14, 2016 when he filed his response in opposition to the motion for summary judgment. See Dkt. No. 73-8. In so doing, Gayemen admitted many of the facts submitted by the School District. The admitted facts are included within this Memorandum.

[4]     Gayemen became a student at Allen after he was expelled from the Bethlehem Area School District for tardiness and absenteeism. At the time that Gayemen attended Allen, he resided in the Bethlehem Area School District.

days that Gayemen had been attending Allen, up until the March 30, 2011 incident, Gayemen did not encounter any other kinds of harassment and no one was threatening Gayemen. Prior to the March 30, 2011 incident, aside from one casual interaction with Quick in a class that they attended together, Gayemen did not have any knowledge of or contact with Cannon, Goodin, Fernandez, or Quick.

On March 30, 2011, as Gayemen was leaving the class he attended with Quick, he was walking through the hallway with Quick when they were joined by Cannon, Goodin, and Fernandez. The group walked outside, and it is Gayemen's testimony that even though he can not recall specifically where he was going, he believed he was on his way to his next class. At the time, Gayemen was wearing a necklace with black, red, and white beads.

When the group reached the breezeway area between the gym and the main building, Goodin asked for Gayemen's necklace. Goodin explained to Gayemen that he wanted Gayemen's necklace because the beads were related to a gang. Gayemen did not know which gang Goodin was referring to, and had no prior knowledge that Cannon, Goodin, Fernandez, and Quick were involved in a gang. Gayemen was not aware of any gang involvement by students at Allen whatsoever.

Without any warning, Goodin sucker punched Gayemen, and then Quick, Cannon, and Fernandez punched and kicked Gayemen. Gayemen testified that he had no reason to believe that any of the students possessed a weapon at the time of the assault. After the assault, Gayemen went to the school office and asked office staff to contact his older cousin who also attended Allen, so that he could tell his cousin what happened. Gayemen's cousin reported to the school office, and she and Gayemen went outside in the hallway. While Gayemen was

4

explaining to his cousin what had happened, a security officer was present in the hallway.

According to his testimony, Gayemen did not speak directly to the security guard at that time.

After Gayemen spoke with his cousin, he went back to class, and did not report the incident to

any other teachers or administrators for the School District.  At the end of the school day,

Gayemen's grandmother took him to St. Luke's Hospital where he was treated for a fractured jaw

and a concussion.

The following morning, two detectives came to question Gayemen about the

incident.  About a week or two after the incident, police came to Gayemen's house to question

him about gang activity.  The detective who handled Gayemen's case later told him that Goodin

and the other students involved in the assault thought that Gayemen was in a gang.  Gayemen

denies that he was involved in any gangs.  Gayemen appeared in court to testify, on behalf of the

prosecution, about the assault.  Cannon was incarcerated as a result of the assault, and Goodin,

Fernandez, and Quick were prosecuted through the juvenile justice system.  Gayemen has not

had contact with Cannon, Goodin, Fernandez, or Quick since the assault, and did not return to

Allen following the assault.

The School District employs security officers to work with the building principals

and assistant principals to secure the schools.  Barry Rodenbaugh ("Rodenbaugh") was, at the

time of the March 30, 2011 incident, the Assistant Director in Charge of Security for the School

District.  In the case of a student assault not involving a sexual assault, the security officer's

responsibility would be to escort the students involved away from the incident to the appropriate

administrator, and then write an incident report.  After the security officer escorts the student

away from the incident, it is the role of the administrator to conduct an investigation and

determine if disciplinary consequences are necessary. School security officers have no role in the discipline of students. Michael Witt ("Witt"), an Allen Security Officer, was not aware of any prior violent incidents that occurred at the location of the March 30, 2011 incident or that involved any of the same students as this incident. Aside from the March 30, 2011 incident, Witt did not know of any violence involving Cannon, Goodin, Fernandez, or Quick.

It is undisputed that a Positive Behavioral Support ("PBS") System was in effect at Allen at the time of the March 30, 2011 incident. The PBS System was in place, via the Student Code of Conduct, to address school-wide behavioral issues. Under the PBS System, student misconduct is classified in four levels based on place of occurrence, frequency of occurrence, and disruptive effect on the safety and orderliness of the learning environment.

"Level I" infractions include classroom disruptions, such as chewing gum and "goofing around," which are managed by the classroom teachers and generally result in a detention, loss of privileges, or conferences with the students' parent. "Level II" infractions include prohibited behaviors during school, school sponsored events, or on school property, such as cheating, bullying, and defiance, and result in administrator-enforced consequences. "Level III" infractions include more serious misconduct, such as assaults on a student, fighting, disorderly conduct, violations of the School District's Gang Policy, or repeat "Level II" infractions, and result in administrative team-enforced consequences, including suspension, or, depending on the severity, expulsion. "Level IV" infractions are expellable offenses and include behaviors that present an immediate danger to the safety and well-being of the total school community, including assaults on students and staff and chronic "Level III" offenders.

It is School District protocol, as set forth in the Student Code of Conduct School-Wide PBS System, that all misconduct constituting a violation of the Pennsylvania Crimes Code, including assaults on students, is to be reported to the School Resource Officer ("SRO") or, if an SRO was not available, to the Allentown City Police.  An SRO is an Allentown City Police officer, who is assigned to a particular school building.  SROs are employees of the Allentown City Police Department, and are not supervised by the School District administration.  In 2011, at least one SRO was assigned to Allen.

The School District also uses "Sapphire" a web-based system, to document and compile student disciplinary incidents, including the PBS System "Level" of the infraction. Sapphire is used in order to identify students who are frequent offenders and remove them from the educational environment.  With violations of the School District's Gang Policy tracked as a PBS System "Level III" infraction, Sapphire tracks students flashing known or recognized gang signs, displays of gang colors, gang identification gear, and other representations by students that they are a part of a gang.  Building administrators, including principals and assistant principals, are responsible for entering every student disciplinary incident and intervention into Sapphire, which is ultimately reviewed by the Director of Community and Student Services.  The Director of Community and Student Services reviews the entries in order to determine that the reports are factual and not emotionally charged.

**Standard of Review**

Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must cite "to particular parts of materials in the record" showing that there is a genuine dispute for trial. Fed. R. Civ. P. 56(c). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325). The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. Celotex, 477 U.S. at 322-323. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper. Id. at 322;

Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

## Discussion

### State-Created Danger Claim

In order to establish a claim under Section 1983, Gayemen must demonstrate that a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States. See Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (*en banc*).  Gayemen's Section 1983 claim rests on the Due Process Clause of the Fourteenth Amendment and invokes its substantive component, which "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).  Specifically, Gayemen alleges that the School District violated his constitutional right to bodily integrity because the School District knew about past violent assaults committed by students, and concealed these past assaults in order to avoid public scrutiny.

In Morrow v. Balaski, 719 F.3d 160 (3d Cir. 2013) (*en banc*), cert. denied, 134 S.Ct. 824 (2013), the United States Court of Appeals for the Third Circuit stressed that the "Supreme Court has long established that '[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process

9

Clause.'"  719 F.3d at 166 (quoting <u>DeShaney v. Winnebago Cty. Dep't of Social Servs</u>., 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).  Nevertheless, Courts have recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment."  <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 235 (3d Cir.2008) (citing <u>D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.</u>, 972 F.2d 1364, 1368 (3d Cir.1992) (citation omitted)).

Gayemen contends that the School District is liable under the "state-created danger" theory.  Under this theory, the Third Circuit has determined "that liability may attach where the state acts to create or enhance a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process."  <u>Morrow</u>, 719 F.3d at 177 (citing <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1205 (3d Cir. 1996)).  To prevail on this theory, Gayemen must prove each of the following four elements:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the conscience;
>
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Morrow</u>, 719 F.3d at 177 (citing <u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (citations and internal quotation marks omitted)).  A plaintiff's failure to satisfy any of the four

elements defeats his state-created danger claim.  See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 914 (3d Cir.1997) (noting the court did not need to decide whether plaintiff satisfied an element of the Kneipp test where he could not satisfy the other three).  To avoid entry of summary judgment against him, Gayemen must present evidence which shows there is a genuine issue of material fact as to each element of his state-created danger claim. See Fed.R.Civ.P. 56(c).

Under the first element, Gayemen must show the harm which befell him was "foreseeable and fairly direct." Bright, 443 F.3d at 281 (citation and internal quotation marks omitted).  "Under Third Circuit jurisprudence, a harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm."  Gremo v. Karlin, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005)

Gayemen argues that prior to the assault, Goodin and one of the other individual defendants were on the security personnel's radar for their involvement with a group of students calling themselves the 'Handsome Boys,' who are associated with a street gang named the Bloods.  Gayemen avers that this information was shared with school staff by Security Resource Officer Jeremy Moll ("SRO Moll"),[5] and alleges that street gangs, such as the Bloods, authorize its student associates to commit gang related assaults within the school.  Specifically, Gayemen points to the deposition testimony of SRO Moll and the declaration of former Assistant Principal James Dotterer ("Dotterer") who indicated that Allen was experiencing problems with fights

---

[5]     SRO Moll testified that Gooden, and possibly Fernandez, were affiliated, or members of, a gang called the Bloods.  Moll did not remember, however, whether this affiliation existed prior to the assault involving Gayemen.

after school, involving members of local gangs.

During oral argument, counsel for Gayemen likened the facts of this case to Gremo v. Karlin, 363 F.Supp.2d 771 (E.D. Pa. 2005).  The Gremo court denied the defendant School District's motion to dismiss a state-created danger Due Process claim, where the plaintiff alleged he was severely beaten by a group of fifteen students, after they threw a garment over his head, in an unmonitored common area of his high school.  Id. at 777. The plaintiff alleged that school officials were aware the same group of students had committed the same kind of attack using the same methods and in the same school locations for two years prior to the attack on the plaintiff. Id. at 778–779.  We find that this matter is distinguishable from Gremo.  Similar to the reasoning set forth by the Honorable Juan R. Sánchez in the case of Smith v. School Dist. of Philadelphia, No. 07-2080, 2009 WL 667455, *4 (E.D. Pa. March 10, 2009), we agree that because this Court is tasked with deciding a motion for summary judgment, and not a motion to dismiss, which sets a lower bar for the nonmoving party than a motion for summary judgment, Gremo is procedurally and factually distinguishable.

In the few days that he had been attending Allen, up until the March 30, 2011 incident, Gayemen did not encounter any other kinds of violence, and no one was harassing or threatening him.  Aside from one casual interaction with Quick in a class that they attended together, Gayemen did not have any knowledge of or contact with any of the other individual defendants, Cannon, Goodin, or Fernandez, prior to the assault.  In addition, at the time of the assault, none of the individual defendants had a history of violence, and they were not known the School District administration or security staff at Allen as having a history of violence.  Gayemen has not shown otherwise.  While Gayemen offers some evidence that Gooden, and possibly one

other individual defendant, may have been affiliated with a street gang, testimony from several

other teachers and/or administrators demonstrate that there was no knowledge of Cannon,

Goodin, Fernandez, and Quick being involved in any gangs.

        Irrespective of any alleged gang involvement, however, it is simply not

foreseeable to state that just because certain individuals may have been on the School District's

"radar" for an alleged association with a street gang, that the assault on Gayemen was foreseeable

and fairly direct.  There was no prior contact or incidents between Gayemen and the four

individual defendants, and Gayemen has not offered any evidence demonstrating that any of the

individual defendants have assaulted anyone else in the school, or that they even had a history of

violence.  In contrast with the statements from SRO Moll and Dotterer regarding a concern with

gang fights occurring after school, we note that this assault took place during school on school

grounds.  At the time of the assault, Gayemen had only been attending Allen for a few days, and

there were no prior incidents of violence or threats against him at any time before the assault took

place.  There was simply no indication that Gayemen would be more likely to be harmed; the

assault to Gayemen, albeit appalling, was sudden and surprising to him.  The foregoing facts

differ substantially from Gremo, which involved the same kind of attack, using the same

methods, in the same school locations, for two years prior to the attack on the plaintiff.

        Without citation, Gayemen asserts in his responsive brief that he has produced

evidence of repeated attacks.  At this stage of litigation, however, Gayemen must produce

evidence such that a reasonable jury could find that his assault was foreseeable and fairly direct.

Smith, 2009 WL 667455, at *4 (citing In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1243

(3d Cir.1989) ("[A] plaintiff may not simply rest upon his bare allegations to require submitting

the issue to a jury; rather, he must present 'significant probative evidence tending to support the complaint.'") (citations omitted).  He has not done so.  We agree with the School District in that general school violence is not enough to establish forseeability of a risk of harm to Gayemen, particularly where the school violence does not specifically include the individuals who attacked Gayemen, and where Gayemen was not a prior target of violence.  See Mohammed v. Sch. Dist. of Phila., 355 F. Supp.2d 779, 784 (E.D. Pa.2005), aff'd, 196 Fed. Appx. 79 (3d Cir. 2006) ("evidence that [the school] was a dangerous environment generally is insufficient to establish that it was foreseeable that [a student] would be punched in the stairwell").  This Court concludes that a jury could not reasonably find that the assault on Gayemen was foreseeable and fairly direct based upon an alleged gang affiliation, particularly when there is no prior record of any violent behavior by any of the individual defendants.

With respect to the second element, Gayemen must demonstrate that a "state actor acted with a degree of culpability that shocks the conscience." Bright, 443 F.3d at 281.  "[I]n *any* state-created danger case, the state actor's behavior must *always* shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible.  In some circumstances, deliberate indifference will be sufficient.  In others, it will not." Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006) (emphasis in original).  "In a 'hyperpressurized environment,' an intent to cause harm is usually required.  On the other hand, in cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient.  Id.

In Morse, the Third Circuit defined the required mental state as either "willful disregard for" or "deliberate indifference to" the safety of the plaintiff.  Morse, 132 F.3d at 910

14

(citing <u>Kneipp</u>, 95 F.3d at 1208 n. 21). Under this standard, the danger must have been foreseeable to the state actors and "the state's actions must evince a willingness to ignore" that foreseeable risk of danger.  <u>Id.</u>  As Judge Sánchez determined in <u>Smith</u>, this Court also finds that the relevant conscience-shocking standard in this case is whether the School District "disregard[ed] a great risk of serious harm," however, even applying the "deliberate indifference" standard, Gayemen nonetheless fails to establish a genuine issue of material fact that the School District's conduct was conscience-shocking.  See <u>Smith</u>, 2009 WL 667455, *5.

Gayemen argues that the School District was deliberately indifferent to the danger imposed by gang related fighting and violent attacks which were repeatedly occurring without School District intervention.  Gayemen further alleges that the School District, which foresaw the danger of continued attacks by the gang affiliated students, acted with deliberate indifference when it concealed the attacks, and failed to address reporting of violence through the Sapphire system[6] and Allentown Police Department.

As explained in more detail with respect to the first element, Gayemen has not set forth sufficient evidence which would demonstrate that any of the individual defendants had a history of violence prior to the assault, or were known the School District administration or security staff at Allen as having a history of violence.  There was no prior contact or incidents of harassment between Gayemen and the four individual defendants, and Gayemen has not offered any evidence demonstrating that any of the individual defendants have assaulted anyone else in the school.

---

[6]     As noted above, the School District uses "Sapphire," a web-based system, to document and compile student disciplinary incidents.

Again, we find the reasoning of Judge Sánchez in the <u>Smith</u> case persuasive.  In <u>Smith</u>, a ninth-grade student by the name of Aaron informed his principal that he was being threatened in school.  The principal tried to reach the student's father, but was unsuccessful.  The principal sent Aaron home about a half-hour before official dismissal time.  Along his walk home, at an intersection about 0.2 miles away from the high school, Aaron was attacked by four young men.  A fellow high school student (S.F.) was later identified as one of the four males who attacked him.  S.F.'s disciplinary record at the high school showed that he was involved in a prior violent incident, a fight with another student which took place prior to the assault on Aaron.  There were no documented incidents between Aaron and S.F. prior to the attack.  <u>Smith</u>, 2009 WL 667455, *1.

In finding that the plaintiff failed to demonstrate a genuine issue of fact as to whether the School District's conduct was conscience-shocking, Judge Sánchez reasoned as follows:

> S.F.'s disciplinary record did not reflect such a dangerous propensity for violence such that a reasonable jury could conclude S.F.'s continued presence at [the high school] was a threat to Aaron's safety. In addition, [the principal]'s reaction did not constitute deliberate indifference because she endeavored to protect Aaron, first by calling his father, and when that was unsuccessful, by sending Aaron home early to avoid an altercation. Smith has presented no evidence she or other School District officials were aware of a specific threat to Aaron on his walk home or of similar attacks off school property.  Even if [the principal]'s actions could be construed as negligent, there is no evidence of deliberate indifference. *See Mohammed*, 196 Fed. Appx. at 82 (concluding School District's failure to monitor the stairwell in which the plaintiff was attacked and failure to maintain an appropriate number of security guards could amount to only negligence or recklessness, neither of which suffice to support a state-created danger claim).

16

Smith, 2009 WL 667455, at *5.  Similar to the Smith case, Gayemen has presented no evidence that any School District officials were aware of a specific threat to him, having attending Allen for just a few days.  If anything, the facts of Smith are somewhat more foreseeable than in this case as a result of S.F.'s disciplinary record.  In this case, Gayemen has not presented any evidence demonstrating that any of the individual defendants have assaulted anyone else in the school, or that they even had a history of violence.

　　　　　Gayemen alleges that the School District acted with deliberate indifference by concealing or failing to report attacks occurring at Allen by gang affiliated students.  Specifically, Gayemen avers that by his declaration, "Dotterer lets it be known the entire issue was ignored and none of these gang affiliated students were removed from the school, meanwhile their involvement in school altercations continued."  Pl. Br. at 13.  Gayemen asserts that violence was not reported through the Sapphire web-based system or to the Allentown Police Department.  Specifically, Gayemen offers the declaration of a former social studies teacher, Deborah A.K. Brobst ("Brobst") that she had entered several classroom infraction referrals ("Level I") into the Sapphire system which went unread, or were erased, without any action being taken.  Pl. Br. at 13.

　　　　　Despite Gayemen's assertions to the contrary, we find that the School District did not act with deliberate indifference.  In fact, the School District had a number of measures in place at Allen in an effort to address inappropriate student behavior.  It is undisputed that a Positive Behavioral Support ("PBS") System was in effect at the time of the March 30, 2011 incident.  The PBS System was in place, via the Student Code of Conduct, to address school-wide behavioral issues.  Under the PBS System, student misconduct was classified in four

levels based on place of occurrence, frequency of occurrence, and disruptive effect on the safety and orderliness of the learning environment. "Level I" infractions include classroom disruptions, such as chewing gum and "goofing around," which are managed by the classroom teachers and generally result in a detention, loss of privileges, or conferences with the students' parent. "Level II" infractions include prohibited behaviors during school, school sponsored events, or on school property, such as cheating, bullying, and defiance, and result in administrator-enforced consequences. "Level III" infractions include more serious misconduct, such as assaults on a student, fighting, disorderly conduct, violations of the School District's Gang Policy, or repeat "Level II" infractions, and result in administrative team-enforced consequences, including suspension, or, depending on the severity, expulsion. "Level IV" infractions are expellable offenses and include behaviors that present an immediate danger to the safety and well-being of the total school community, including assaults on students and staff and chronic "Level III" offenders. It is also undisputed that it was School District protocol, as set forth in the Student Code of Conduct School-Wide PBS System, that all misconduct constituting a violation of the Pennsylvania Crimes Code, including assaults on students, was to be reported to the School Resource Officer ("SRO") or, if an SRO was not available, to the Allentown City Police.

Gayemen has not provided any evidence of record concerning the concealment of any violence, and, in particular, gang-affiliated assaults at Allen, by the School District. With respect to the declaration of Dotterer, he stated that he knew about after school altercations involving gang-affiliated students, and reported the altercations to the School District Administration. Dotterer provided no additional facts, and instead offered his opinion that his report was ignored and the offending students were permitted to remain in the school. The

offending students are not identified.  We note that Dotterer did not provide any testimony as to the individual defendants having a history of violence.  It is well established that "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment."  Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 666 (3d Cir. 2016); see also Lexington Inc. Co. v. W. Pa. Hosp., 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a genuine issue of fact.'") (quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995)).

        With respect to the infractions identified by Brobst that Gayemen claims went unread, or were deleted, we note that, according to her declaration, teachers only handled reporting Level I infractions.  As noted above, "Level I" infractions include classroom disruptions, such as chewing gum and "goofing around," which are managed by the classroom teachers and generally resulted in a detention, loss of privileges, or conferences with the students' parent.  These types of infractions are obviously not the types of infractions, as set forth in the Student Code of Conduct, which would have been required to be reported to the SRO or to the Allentown City Police.  This Court is hard-pressed to assert that any alleged concealment by the School District of these types of infractions would be conscience-shocking.

        Because there were no past incidents of violence involving Gayemen or the individual defendants, Cannon, Goodin, Fernandez, and Quick, there is no evidence of a failure to report past incidents involving the individual defendants who assaulted Gayemen or of any past incidents or threats to him.  Accordingly, because no rational jury could conclude from the record evidence that the School District was deliberately indifferent to Gayemen's plight, it did not act with a degree of culpability that shocks the conscience.

With respect to the third element, Gayemen must prove that "a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." Bright, 443 F.3d at 281 (citation and internal quotation marks omitted). The relationship requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." Kneipp, 95 F.3d at 1209 n. 22. In this matter, Gayemen avers that he was a member of a discrete class of persons as one of the students who attended Allen, who was subject to harm as a result of the School District's actions. See Gremo, 363 F.Supp.2d at 789 (concluding the plaintiff was a member of a discrete class of persons, namely, the students who attended the plaintiff's high school, who were subjected to potential harm as a result of the state's actions). This Court, as did Judge Sánchez in Smith, concludes that Gayemen's attendance at Allen constituted a relationship between him and the School District such that he would be a foreseeable victim of an alleged danger created by the School District. See Smith, 2009 WL 667455, at *5.

Even assuming, _arguendo_, that Gayemen could satisfy the other elements of the state-created danger test, he plainly fails to satisfy the fourth element, which requires that a state actor affirmatively use his or her authority to create a danger. The Third Circuit in Bright stressed "that under the fourth element of a state-created danger claim, '[l]iability . . . is predicated upon the states' _affirmative acts_ which work to the plaintiffs' detriments in terms of exposure to danger.' It is misuse of state authority, _rather than a failure to use it_, that can violate the Due Process Clause." 443 F.3d at 282 (second emphasis added) (quoting D.R. by L.R., 972

F.2d at 1374).[7]  <u>Sanford</u> reaffirmed <u>Bright</u>'s requirement by holding that the plaintiff in that case

failed by attempting to "recharacterize" the defendant's actions as "affirmative actions" because

failure to prevent harm simply does not constitute harm.  <u>Sanford</u>, 456 F.3d at 312.

   With respect to the last element, Gayemen alleges that the failure of the School

District to take appropriate steps to address the student-affiliated gang violence placed him in a

more dangerous position.  More specifically, Gayemen avers that the School District, by actively

investigating and identifying student offenders, but refusing to remove them from Allen,

encouraged the offending students to commit more acts of violence, and made him more

vulnerable to the danger of attack.  Again, Gayemen relies on the declaration of Dotterer, which

provides, in pertinent part, as follows:

> In November of 2010, I was serving as assistant principal at
> [Allen] . . . . We had been having problems with fights at dismissal
> time involving member of various local gangs . . . and students
> enrolled at [Allen]. . . .
>
> I was approached by then Deputy Superintendent Dr. Russell Mayo
> and Director of Secondary Education David Wildonger about
> identifying the students who were involved in these after-school
> altercations. Dr. Mayo and Mr. Wildonger directed me to provide
> them with a list of the ten worst student offenders who were
> involved in these altercations.
>
> I was told by Dr. Mayo and Mr. Wildonger that once I had
> identified these students, when we returned from Thanksgiving

---

[7] Gayemen argues that under <u>Morse</u>, whether the School District's influence is properly
characterized as an affirmative act or an omission is not determinative, and the dispositive consideration is "whether
the state has in some way placed the plaintiff in a dangerous position that was foreseeable."  Pl. Br. at 20 (quoting
<u>Morse</u>, 132 F.3d at 915).  More recently, however, the panel majority in <u>Bright</u> stressed that the fourth element
requires an affirmative act on the defendant's part.  <u>Bright</u>, 443 F.3d at 282.  Moreover, in <u>Kaucher</u>, the Third Circuit
noted that "a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the
test, is not sufficient.  There must be a direct causal relationship between the affirmative act of the state and
plaintiff's harm.  Only then will the affirmative act render the plaintiff 'more vulnerable to danger than had the state
not acted at all.'"  <u>Kaucher</u>, 455 F.3d 418, 432 (3d Cir. 2006) (quoting <u>Bright</u>, 443 F.3d at 281).

vacation, these students would no longer be enrolled at [Allen] and would be put into alternative education programs.

. . . I identified the ten worst offenders who were involved in these after school activities.

I presented this list to Mr. Wildonger and was assured that this would be taken care of when we returned from Thanksgiving vacation. When we returned from this vacation, none of the ten students who I had identified was removed from [Allen] and their involvement in these after-school altercations continued. . . .

When I confronted Mr. Wildonger about what was to be done, the entire issue was ignored and the subject was changed. None of these students were removed from the school until they ran afoul of the law and were removed by the juvenile justice system.

See Dkt. 73-4; Pl. Br., Ex. C.

In Smith, the Court held that there was no "affirmative act," even though the plaintiff was attacked after being released from school to walk home alone by the school principal, who knew plaintiff was being threatened. Keeping with Third Circuit jurisprudence, the Court held that the school's failure to protect plaintiff does not constitute an "affirmative act." Smith, 2009 WL 667455, at *6. Specifically, Judge Sánchez concluded that plaintiff's assertions that the School District's failure to remove the offending student from the high school coupled with its alleged failure to protect a student from a threatened attack "amount to allegations of failure to act. Such allegations are insufficient to support a state-created danger claim." Id.

Further, in Morrow, the Third Circuit refused to treat the failure to expel the bully, or allowing him to return to school following a suspension, as affirmative acts. 719 F.3d at 178-179. It similarly refused to treat the school's failure to prevent the bully from boarding the

22

plaintiffs' bus as an affirmative act.  Id. ("merely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct").  Moreover, the Third Circuit found that

> [w]hile the Morrows make much of the fact that Defendants' failure to expel [the offending student] after she was adjudicated 'guilty of a crime' may have been contrary to a school policy mandating expulsion in such circumstances, we decline to hold that a school's alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here.

Morrow, 719 F.3d at 178.

Here, as in Smith and Morrow, supra, there is no evidence of an affirmative act. Gayemen has failed to produce evidence of affirmative steps taken by the School District that rendered him more vulnerable to danger than if the School District had not acted at all.  Rather, Gayemen unsuccessfully seeks to couch an act of omission - failure to suspend or expel student offenders, failure to discipline - as affirmative acts.  Gayemen produces no evidence that the School District concealed prior violent behavior.[8]   There is no evidence that the School District

---

[8]   Although Gayemen does not aver with specificity in his responsive brief that the declaration and/or testimony of Michael Witt ("Witt"), a security officer at Allen at the time of the assault on Gayemen, supports his theory of concealment, this Court will address it nonetheless.  When Judge Leeson denied the School District's motion to dismiss on April 16, 2015, without making any determination as to whether the School District did or did not conceal student assaults, Judge Leeson stated that, if proven, an affirmative act might be established if Witt was, in fact, instructed by the School District administration not to report student assaults to the police or SRO.  See Dkt. No. 48, Memorandum at 4.  We conclude, however, that based on all of the evidence of record discovered in this matter since the ruling on the motion to dismiss, Witt's statements do not raise a genuine issue of material fact.

According to the admitted facts, as a security officer, it was Witt's responsibility to escort student offenders to building administrators, who would then conduct an investigation and decide the appropriate discipline of students.  It was not Witt's role to discipline students.  Accordingly, even if Witt were instructed not to report incidents of assault to the police, his testimony would not provide any evidence of an affirmative act of concealment. To the contrary, it simply was not one of his job responsibilities.  As noted by the School District and the record evidence, the consistent testimony of every School District administrator who was deposed, along with the relevant documentary evidence, establishes that incidents of assault were to be reported to the police.  There is no evidence that reports of assaults were concealed or the facts were diluted.  Moreover, it is admitted by Gayemen that Witt had no prior knowledge of any of the students involved in this assault.  Therefore, there is no evidence that Witt was instructed not to report assaults by the four particular students who assaulted Gayemen.

had information and chose to ignore that the four individual defendants were violent, or would target Gayemen.  There is simply no evidence that the School District took affirmative steps that exposed Gayemen to greater danger.  See D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1376 (3d Cir. 1992) (no liability for school's failure to investigate and stop known instances of sexual abuse) (en banc); Brown v. School Dist. of Phila., No. 08-2787, 2010 WL 2991741, at *8 (E.D. Pa. July 28, 2010) ("[F]ailure or refusal to discipline, transfer or expel student violators is not a state created danger.").

Gayemen has failed to adduce sufficient evidence to show the existence of all four of the required elements of a state-created danger claim.  Accordingly, this Court will grant the School District's motion for summary judgment on this basis.  See Celotex, 477 U.S. 323 ("The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.") (quoting Fed. R. Civ. P. 56(c)).

<u>Monell Claim</u>

In addition to the state-created danger theory, Gayemen avers that the School District may be held liable under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  In order to hold the School District liable under this theory, Gayemen must demonstrate that there was a constitutional violation and that the violation was caused by the School District's policy or custom.  Bridges ex rel. D.B. v. Scranton Sch. Dist., No. 14-4565, 2016 WL 953003, at *5 (3d Cir. Mar. 14, 2016) (citing Monell, 436 U.S. at 690-691).

This Court must first determine "whether plaintiff's harm was caused by a constitutional violation."  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).  Because this Court has already ruled against Gayemen on this issue, judgment must be entered in favor of the School District.  <u>See</u> <u>Bridges</u>, 2016 WL 953003, at *5 (Appellants cannot recover from the School District under Section 1983 for a failure to train because there was no underlying constitutional violation); <u>Mohammed</u>, 355 F. Supp.2d at 787 (Because the School District and its employees did not create the danger that resulted in [plaintiff]'s harm, any failure to protect [him] from the misguided punch was not an infringement on his constitutional rights.)  Because there has been no constitutional harm, the School District cannot be liable under § 1983.

## <u>Conclusion</u>

Defendant Allentown School District's Motion for Summary Judgment will be granted.  An Order follows.